# United States Court of Appeals for the Federal Circuit

---

**STONE LION CAPITAL PARTNERS, L.P.,**
*Appellant,*

v.

**LION CAPITAL LLP,**
*Appellee.*

---

2013-1353

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in Opposition No. 91191681.

---

Decided: March 26, 2014

---

PRATIK A. SHAH, Akin Gump Strauss Hauer & Feld, LLP, of Washington, DC, argued for appellant. Of counsel on the brief were KAROL A. KEPCHAR, RUTHANNE M. DEUTSCH and EMILY C. JOHNSON.

MICHAEL CHIAPPETTA, Fross, Zelnick, Lehrman & Zissu, P.C. of New York, New York, argued for appellee.

---

Before RADER, *Chief Judge,* REYNA, and WALLACH, *Circuit Judges.*

WALLACH, *Circuit Judge*.

Stone Lion Capital Partners, L.P. ("Stone Lion") appeals from the Trademark Trial and Appeal Board's ("Board") decision refusing registration of the mark "STONE LION CAPITAL" due to a likelihood of confusion with opposer Lion Capital LLP's ("Lion") registered marks, "LION CAPITAL" and "LION." Because the Board's decision is supported by substantial evidence and in accordance with the law, this court affirms.

BACKGROUND

I. The Parties

Both Stone Lion and Lion are investment management companies. Appellant Stone Lion is a New York based company founded in November 2008, and manages a hedge fund that focuses on credit opportunities. Appellee Lion is a private equity firm based in the United Kingdom that invests primarily in companies that sell consumer products.

Lion has two registered marks with the Patent and Trademark Office ("PTO"), "LION CAPITAL" and "LION." Lion started using these marks in the United States in April 2005, and filed the applications for "LION CAPITAL" and "LION" in May 2005 and October 2007, respectively.[1] The services recited in connection with Lion's registered trademarks include "financial and investment planning and research," "investment management services," and "capital investment consultation" for "LION"; and "equity capital investment" and "venture capital services" for "LION CAPITAL." J.A. 7–8. There is

---

[1] The PTO granted Lion's application for "LION CAPITAL" in December 2008 and for "LION" in June 2009.

no dispute that Lion has priority over Stone Lion with respect to these marks.

## II. Proceedings Before the Board

On August 20, 2008, Stone Lion filed an intent-to-use application to register the mark "STONE LION CAPITAL" with the PTO. It proposed using the mark in connection with "financial services, namely investment advisory services, management of investment funds, and fund investment services." U.S. Trademark Application Serial No. 77551196 (filed Aug. 20, 2008). Lion opposed the registration under section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d) (2006), alleging Stone Lion's proposed mark would be likely to cause confusion with Lion's registered marks when used for Stone Lion's recited financial services.

The Board conducted the likelihood of confusion inquiry pursuant to the thirteen factors set forth in *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361 (C.C.P.A. 1973):

> (1) The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.
>
> (2) The similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use.
>
> (3) The similarity or dissimilarity of established, likely-to-continue trade channels.
>
> (4) The conditions under which and buyers to whom sales are made, i.e. "impulse" vs. careful, sophisticated purchasing.
>
> (5) The fame of the prior mark (sales, advertising, length of use).

(6) The number and nature of similar marks in use on similar goods.

(7) The nature and extent of any actual confusion.

(8) The length of time during and conditions under which there has been concurrent use without evidence of actual confusion.

(9) The variety of goods on which a mark is or is not used (house mark, "family" mark, product mark).

(10) The market interface between applicant and the owner of a prior mark . . . .

(11) The extent to which applicant has a right to exclude others from use of its mark on its goods.

(12) The extent of potential confusion, i.e., whether *de minimis* or substantial.

(13) Any other established fact probative of the effect of use.

*Id.* The parties presented evidence regarding factors one through six. The Board found that factors one through four weighed in favor of finding a likelihood of confusion, and that the remaining factors were neutral. With respect to the first factor, the similarity of the marks, the Board reasoned that Stone Lion's mark "incorporates the entirety of [Lion's] marks," and that the noun "LION" was "the dominant part of both parties' marks." J.A. 13–14. The addition of the adjective "STONE" was "not sufficient to distinguish the marks," and the Board concluded the marks were "similar in sight, sound, meaning, and overall commercial impression." J.A. 14.

The Board determined the second *DuPont* factor, the similarity of the services, "weigh[ed] strongly in favor of likelihood of confusion," J.A. 10, because at least some of the services recited in Stone Lion's application were

"legally identical" to Lion's covered services, J.A. 11. For example, Stone Lion's applied-for services "management of investment funds" and "investment advisory services" were at least coextensive with Lion's recited services "management of a capital investment fund" and "capital investment consultation," respectively. J.A. 10.

The Board found the third *DuPont* factor, considering the application's and registrations' "channels of trade," also weighed strongly in favor of finding a likelihood of confusion. "[B]ecause the services described in the application and opposer's registrations are in part legally identical," the Board presumed the services "'travel[ed] in the same channels of trade and [were] sold to the same class of purchasers.'" J.A. 11 (quoting *In re Smith & Mehaffey*, 31 U.S.P.Q.2d 1531, 1532 (T.T.A.B. 1994)).

Finally, the Board found that factor four, the sophistication of the purchasers, weighed in favor of Lion. Although the Board acknowledged that the parties in fact targeted "sophisticated" investors and required large minimum investments, it was "constrained to consider the parties' services as they are recited in the application and registrations, respectively." J.A. 19. Because Stone Lion's "investment advisory services" and Lion's "capital investment consultation" "could be offered to, and consumed by anyone . . . , including ordinary consumers seeking investment services," the Board found the fourth *DuPont* factor favored Lion. J.A. 19.

The remaining factors were found to be "neutral." In particular, the Board found factor five—the strength of Lion's marks—was neutral because Lion failed to show "that its marks are well-known in the financial services field." J.A. 14. With respect to the sixth factor regarding the number and nature of similar third-party marks, the Board attached little importance to Stone Lion's internet printouts referencing third-party investment groups with "LION" in their name, stating that such "third-party

evidence . . . generally has minimal probative value where, as here, it is not accompanied by any evidence of consumer awareness." J.A. 16. The Board ultimately found there was not a "crowded field of LION-formative marks for similar investment services." J.A. 18. Upon weighing all of the pertinent *DuPont* factors, the Board found Lion met its burden to establish a likelihood of confusion by a preponderance of the evidence, and refused Stone Lion's application.

Stone Lion filed this timely appeal. This court has jurisdiction pursuant to 15 U.S.C. § 1071(a)(1) (2012) and 28 U.S.C. § 1295(a)(4)(B) (2012).

## DISCUSSION

Section 2(d) of the Lanham Act provides that a trademark may be refused registration if it so resembles a prior used or registered mark "as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d). Likelihood of confusion is a question of law with underlying factual findings made pursuant to the *DuPont* factors. *M2 Software, Inc. v. M2 Commc'ns, Inc.*, 450 F.3d 1378, 1381 (Fed. Cir. 2006). This court reviews the Board's factual findings on each *DuPont* factor for substantial evidence, *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003), and its legal conclusion of likelihood of confusion de novo, *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1084 (Fed. Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

On appeal, Stone Lion challenges the Board's findings with respect to *DuPont* factors one, three, and four. It contends the Board: (1) "conducted an erroneous comparison of the marks," pursuant to factor one, Appellant's Br. 32, (2) "erred in analyzing the purchasers and trade

channels" in factor three, *id.* at 42, and (3) "committed legal error in dismissing purchaser sophistication and conditions of sale" in factor four, *id.* at 22. Each argument is considered in turn.

## I. The Board Properly Compared the Marks Pursuant to the First *DuPont* Factor

The similarity of the marks is determined by focusing on "'the marks in their entireties as to appearance, sound, connotation, and commercial impression.'" *Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369 1371 (Fed. Cir. 2005) (quoting *DuPont*, 476 F.2d at 1361). With respect to the Board's reasoning that Stone Lion's mark "incorporates the entirety of [Lion's] marks," Stone Lion contends "the Board's analysis rests on the faulty assumption that incorporating an opposer's mark necessarily results in a likelihood of confusion," which, it says, "is not the law."[2] Appellant's Br. 34. Stone Lion further criticizes the Board's finding that the noun "LION" was "the dominant part of both parties' marks." J.A. 14. "'[L]ikelihood of confusion cannot be predicated on dissection of . . . only part of a mark,'" and Stone Lion argues "the Board's analysis undertook the very dissection of the mark that this Court forbids." Appellant's Br. 33 (quoting *In re Nat'l Data Corp.*, 753 F.2d 1056, 1059 (Fed. Cir. 1985)). According to

[2] Stone Lion argues the Board's "incorporation" analysis is improper for the additional reason that it gave "CAPITAL" meaningful weight, even though both parties "disclaimed the exclusive right to the term." Appellant's Br. 33–34. The Board recognized the parties' disclaimer, however, and accordingly attached less significance to that term. J.A. 13 (quoting *In re Code Consultants, Inc.*, 60 U.S.P.Q.2d 1699, 1702 (T.T.A.B. 2001) (disclaimed subject matter is often "less significant in creating the mark's commercial impression")).

Stone Lion, the Board improperly "fail[ed] to assess the commercial impression made by STONE LION CAPITAL as a whole." *Id.* at 33.

These arguments misconstrue the Board's analysis. The Board properly considered whether the marks were "similar in sight, sound, meaning, and overall commercial impression." J.A. 14. Although it reasoned that "LION" was "dominant" in both parties' marks, "there is nothing improper in stating that . . . more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties." *In re Nat'l Data Corp.*, 753 F.2d at 1059. Nor did the Board err by according little weight to the adjective "STONE," on the ground that it did not "distinguish the marks in the context of the parties' services." J.A. 13–14; *see* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:50 (4th ed.) ("[A]ddition of a suggestive or descriptive element is generally not sufficient to avoid confusion."); *see also In re Rexel Inc.,* 223 U.S.P.Q. 830 (T.T.A.B. 1984) (finding likelihood of confusion between GOLIATH for pencils and LITTLE GOLIATH for a stapler). The Board properly rested its "ultimate conclusion" of similarity "on consideration of the marks in their entireties." *See In re Nat'l Data Corp.*, 753 F.2d at 1059.

Stone Lion also challenges the Board's finding that the proposed mark has the same overall commercial impression as Lion's registered marks. It contends that "STONE LION" "is the most communicative and evocative aspect of the mark," and "contains an initial sibilant sound not found in either of Lion Capital's marks." Appellant Br. 38. Its "meaning[ is] also quite different," according to Stone Lion, and connotes "patience, courage, fortitude and strength" as opposed to "just LION, which communicates no such lithic significance." *Id.* The record adequately supports the Board's contrary conclusions, however, and the Board did not err in finding that

"STONE LION CAPITAL" is "similar in sight, sound, meaning, and overall commercial impression" to "LION CAPITAL" and "LION." *See* J.A. 14.

Finally, Stone Lion argues the Board gave inadequate weight to Lion's statements during prosecution of its "LION CAPITAL" registration distinguishing the third-party mark "ROARING LION." Appellant's Br. 40. A party's prior arguments may be considered as "illuminative of shade and tone in the total picture," but do not alter the Board's obligation to reach its own conclusion on the record. *Interstate Brands Corp. v. Celestial Seasonings, Inc.*, 576 F.2d 926, 929 (C.C.P.A. 1978). The Board's findings under the first *DuPont* factor are affirmed.[3]

## II. The Board Properly Compared the Relevant Trade Channels Pursuant to the Third *DuPont* Factor

The third *DuPont* factor considers "[t]he similarity or dissimilarity of established, likely-to-continue trade

---

[3] Stone Lion contends "the Board committed legal error by according excessive weight to the perceived similarities between the marks." Appellant's Br. 39. According to Stone Lion, "having concluded that the Lion Capital marks are not strong or well-known in the financial services field, the Board overlooked that the level of renown of an opposer's mark is supposed to play a 'dominant role in the process of balancing the *DuPont* factors.'" *Id.* (quoting *Recot, Inc. v. M.C. Becton*, 214 F.3d 1322, 1327 (Fed. Cir. 2000)). The Board never found that Lion's marks were weak. It found that in spite of news about Lion's investments featured in, e.g., *The Wall Street Journal* and *The New York Times*, the marks were not "well-known." J.A. 14. Stone Lion does not challenge these fact-findings on appeal, and the Board did not err in declining to give this neutral factor determinative weight in its likelihood of confusion analysis.

channels." *DuPont*, 476 F.2d at 1361. The Board found the application and the registrations contained "no limitations" on the channels of trade and classes of purchasers and therefore "presume[d] that the parties' services travel through all usual channels of trade and are offered to all normal potential purchasers." J.A. 11. The parties' recited services were in part legally identical, so the Board concluded the "channels of trade and classes of purchasers are the same." J.A. 11. Because the application and registrations shared the same channels of trade and classes of purchasers, the Board determined the third *DuPont* factor weighed in favor of finding a likelihood of confusion.

On appeal, Stone Lion contends the Board "fail[ed] to examine the record to determine *which types of persons* within these organizations the parties normally dealt with." Appellant's Br. 43. It contends the Board's findings on the third *DuPont* factor are unsupported by substantial evidence because there was no overlap between the parties' *actual* investors.

It was proper, however, for the Board to focus on the application and registrations rather than on real-world conditions, because "the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application." *Octocom Sys., Inc. v. Houston Comp. Servs. Inc.*, 918 F.2d 937, 942 (Fed. Cir. 1990). This is so "regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which sales of the goods are directed." *Id.* Even assuming there is no overlap between Stone Lion's and Lion's current customers, the Board correctly declined to look beyond the application and registered marks at issue. An application with "no restriction on trade channels" cannot be "narrowed by testimony that the applicant's use is, in fact, restricted to a particular class of purchasers." *Id.* at 943. The Board thus properly

found Stone Lion's application and Lion's registrations covered the same potential purchasers and channels of trade.

### III. The Board Properly Considered the Sophistication of Potential Customers Under the Fourth *DuPont* Factor

The fourth *DuPont* factor considers "[t]he conditions under which and buyers to whom sales are made, i.e. 'impulse' vs. careful, sophisticated purchasing." *DuPont*, 476 F.2d at 1361. Although recognizing that Stone Lion and Lion in fact require large minimum investments and target sophisticated investors, the Board focused on the sophistication of all *potential* customers of "the parties' services as they are recited in the application and registrations, respectively." J.A. 19. Stone Lion's application includes all "investment advisory services," and Lion's registrations include "capital investment consultation." J.A. 8, 10. Such services, the Board found, "are not restricted to high-dollar investments or sophisticated consumers," but rather "could be offered to, and consumed by, anyone with money to invest, including ordinary consumers seeking investment services." J.A. 19.

Stone Lion does not contest the broad scope of the services claimed in its application, but nevertheless argues the Board erred in considering the sophistication of potential customers. Both parties agree their current investors are sophisticated. In light of the services currently offered by Stone Lion and Lion, securities regulations require substantive, preexisting relationships with potential investors before they may invest. Stone Lion contends the Board failed to give proper weight to this clientele sophistication. Appellant's Br. 24.[4]

---

[4]    Once such sophistication is considered, Stone Lion maintains there is no likelihood of confusion at the point of sale, because any potential confusion would be resolved

Stone Lion effectively asks this court to disregard the broad scope of services recited in its application, and to instead rely on the parties' current investment practices. This would be improper because the services recited in the application determine the scope of the post-grant benefit of registration. "[R]egistration provides the registrant with prima facie evidence of . . . the registrant's 'exclusive right' to use the mark on or in connection with *the goods and services specified in the certificate of registration.*" *U.S. Search LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 524 (4th Cir. 2002) (emphasis added); *see also* 15 U.S.C. § 1115(a) (the registration is prima facie evidence of the registrant's exclusive right to use the mark

---

during the lengthy qualification process for qualified investors. Appellant's Br. 24 (citing J.A. 303). It contends this court has declined to recognize any form of confusion other than point-of-sale confusion. *Id.* at 28 (citing *Weiss Assocs., Inc. v. HRL Assocs., Inc.*, 902 F.2d 1546, 1549 (Fed. Cir. 1990) ("reserv[ing]" consideration of initial interest confusion "for another time")). Lion responds that, even assuming a lack of point-of-sale confusion, "the Board did not err in finding likelihood of confusion" in light of the multiple other forms of "actionable confusion, including confusion as to affiliation or connection, initial interest confusion, post-sale confusion, reverse confusion, confusion of non-purchasers causing damage to reputation, etc." Appellee's Br. 41 (citing 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:5 (4th ed.)).

There is no need to address these contentions. As discussed below, the Board properly held the recited services may be offered to ordinary consumers and Stone Lion does not contest that such consumers may be confused at the point of sale. This finding is sufficient to affirm the Board's conclusion that the fourth *DuPont* factor favored opposer Lion.

"in connection with the goods or services specified in the registration"). Other benefits of registration are likewise commensurate with the scope of the services recited in the application, not with the applicant's then-existing services. *See, e.g.*, 15 U.S.C. § 1072 (federal registrants enjoy nationwide constructive notice of their ownership of the registered mark); *id.* § 1117 (allowing recovery of defendant's profits, plaintiff's damages, and the costs of the action for violation of a registered mark). It would make little sense for the Board to consider only the parties' current activities when the intent-to-use application, not current use, determines the scope of this post-grant benefit. Parties that choose to recite services in their trademark application that exceed their actual services will be held to the broader scope of the application. *See Octocom Sys.*, 918 F.2d at 943 (stating that a broad application "is not narrowed by testimony that the applicant's use is, in fact, restricted").

At oral argument, Stone Lion contended that although it is normally proper to focus on the services recited in the application, investor sophistication should be ascertained from the record as a whole. It argued that limiting the investor sophistication analysis to the four corners of the application is contrary to *DuPont*, where our predecessor court considered "all of the evidence" on sophistication, not only the services recited in the application. In *DuPont*, the Board found likelihood of confusion between DuPont's applied-for mark, RALLY, for "combination polishing, glazing and cleaning agent for use on automobiles," and the opposer's "registered mark RALLY for an all-purpose detergent." *DuPont*, 476 F.2d at 1359. While DuPont's appeal was pending before the Board, DuPont had purchased Horizon's mark in the context of automobile products and the parties entered into an agreement allowing DuPont to use the mark in the "automotive aftermarket" and "incidentally usable" products, and

limiting Horizon to the "commercial building or household market." *Id.*

Our predecessor court reversed the Board's refusal of DuPont's application, holding that substantial weight should be given to the parties' "detailed agreement[ ]." *Id.* at 1362. Although such reasoning reaches beyond the application, it does so only to the extent that the parties legally bound themselves to using the mark in their respective product category. *See id.* at 1363 (explaining that if either party strays beyond their product category set forth in the agreement, they would be subject to a breach of contract action). Such a binding agreement limits the benefits of registration. For instance, the agreement's provision limiting each party to different product categories would rebut the evidentiary value of a registered mark provided in 15 U.S.C. § 1115(a) (registration provides prima facie evidence of the registrant's exclusive right to use the mark "in connection with the goods or services specified in the registration"). The *DuPont* court contrasted such a binding agreement to "a naked 'consent,'" which it found would merit little weight because "the consenter may continue or expand his use." *Id.* at 1362.

Stone Lion has not provided a naked consent, much less contractually restricted itself to its current high-minimum-investment services. To the contrary, it admitted during oral argument that it could someday offer investment services in connection with college education funds. Oral Arg. at 29:10–29:28, *Stone Lion Capital Partners v. Lion Capital LLP, available at* http://www.cafc.uscourts.gov/oral-argument-recordings/all/stone-lion.html. Granting Stone Lion's application would entitle it to the full scope of services recited therein, and Stone Lion cannot now distance itself from such breadth when faced with an opposition.

Accordingly, the Board properly considered *all* potential investors for the recited services, including ordinary consumers seeking to invest in services with no minimum investment requirement. Although the services recited in the application also encompass sophisticated investors, Board precedent requires the decision to be based "on the least sophisticated potential purchasers." *Gen. Mills, Inc. v. Fage Dairy Proc. Indus. S.A.*, 100 U.S.P.Q.2d 1584, 1600 (T.T.A.B. 2011), *judgment set aside on other grounds*, 2014 WL 343267 (T.T.A.B. Jan. 22, 2014); *cf. Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 293 (3d Cir. 1991) (stating, in the context of a trademark infringement case, that "when a buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class"). Substantial evidence supports the Board's finding that such ordinary consumers "will exercise care when making financial decisions," but "are not immune from source confusion where similar marks are used in connection with related services." J.A. 19 (citing *In re Research & Trading Corp.*, 793 F.2d 1276 (Fed. Cir. 1986)). The Board's conclusion that the fourth *DuPont* factor weighs in opposer Lion's favor is consistent with Stone Lion's application, Lion's registrations, and with applicable law.

CONCLUSION

The Board properly determined that the first four *DuPont* factors weighed in favor of finding a likelihood of confusion and that the remaining factors were neutral. The refusal of Stone Lion's application for trademark registration is therefore affirmed.

**AFFIRMED**